Argued July 9, affirmed September 8, 1965

## STATE OF OREGON *v.* BATES
405 P. 2d 551

*Kenneth E. Shetterly,* Dallas, argued the cause and filed the brief for appellant.

*Marvin J. Weiser,* District Attorney for Polk County, Dallas, argued the cause and filed the brief for respondent.

Before McALLISTER, Chief Justice, and SLOAN, GOODWIN, HOLMAN and LUSK, Justices.

HOLMAN, J.

Defendant, a nineteen-year-old youth, was charged with the second degree murder of his twelve-year-old brother who died by the discharge of a 410-gauge shotgun. Defendant was found guilty of manslaughter and

appeals. The only issue on appeal is whether the evidence was sufficient to sustain the conviction. The case against defendant was largely circumstantial and therefore requires a more detailed examination of the evidence than is usual.

■ While the testimony was at times contradictory, when it is examined in a manner most favorable to the state, as is required after a verdict of guilt, there was evidence from which the jury could find the following to be true.

Defendant and his brother resided with their widowed mother. On the day in question there were present in the home two small children of a sister-in-law who were being temporarily cared for by their grandmother, defendant's mother. Defendant's mother left the home to go to a self-service laundry to wash and dry some clothes, leaving the two grandchildren in the care of her sons. While she was gone the tragedy occurred.

The first notice anyone had that something was amiss was when the defendant called the telephone operator and asked for help. A few minutes later two deputy sheriffs arrived at the scene. They found the deceased lying in a pool of blood on a blanket on a davenport in the living room with a gunshot wound in his right armpit. Upon being asked what had occurred, the defendant said "I shot him." Upon further questioning he first said the deceased had come after him with the gun. He told of an accidental discharge during a struggle between defendant and deceased for possession of the gun which occurred when defendant attempted to take the gun from deceased. However, he later said the deceased had been pointing it at the two babies because he had become angry at them because of their crying and "fussing," that deceased

had threatened the children with the gun, and that the struggle had ensued when defendant attempted to take possession of the gun to protect the children.

There was blood in a bedroom and in the living room. Defendant claimed that the struggle had commenced in the kitchen and had continued through the living room and into the bedroom where the accidental discharge occurred after which he had assisted the deceased to the davenport in the living room. The amount and distribution of the blood in the bedroom indicated that this was, in fact, where the shot had been fired. Although the rooms were cluttered with an unusual quantity of furniture, boxes, and miscellaneous household equipment, there was no evidence of disarray indicating a violent struggle. The deceased was five feet tall and weighed about one hundred pounds. The defendant was five feet nine inches and weighed about one hundred fifty pounds.

The gun was found hanging in its accustomed place on the living room wall. The shell casing had been removed from the gun and was found on the back porch where it was shown to the deputies by defendant. The gun was the single shot type and the hammer had to be pulled back and cocked before it would fire. Because of a safety mechanism it could not be fired by a jar or shock; the trigger had to be depressed.

It was impossible for the deceased to have depressed the trigger since the muzzle of the gun was ten to fourteen inches away from deceased's body at the time of its discharge. At the time it was fired it was pointed downward at a 50 degree angle from the horizontal. The jury could have found that the deceased must have been low on the floor at the time of the gun's discharge; otherwise, the butt of the gun

would have to have been held at almost ceiling height to inflict the type of wound the deceased received.

A microscopic examination of the shell casing indicated that it had been inserted in the gun four different times and that the firing pin had hit it twice after its last insertion. This meant that it had misfired once and had been recocked and fired a second time since the shell was last inserted in the gun. There was no evidence the deceased had attempted to fire the gun prior to the struggle defendant described. Therefore, the only possible way all of this could have occurred—other than by the intentional act of the defendant—was in the alleged struggle, or the gun had misfired at some previous time and had been hung on the wall without having been unloaded. Defendant was the only one who used the gun except his brother who used it only when defendant was present. The gun was always unloaded before it was put back on the wall. The two possible explanations other than the intentional act of the defendant were extremely unlikely.

The defendant was shown to have had fits of temper in the past, and he told a confused and sometimes contradictory story of the occurrence. Many times he claimed he could not recall exactly what had occurred.

■ The veteran trial judge of many years experience thought it was a close case but concluded there was sufficient evidence of homicide to submit the case to the jury. With this decision we agree. There was sufficient evidence of both second degree murder and of manslaughter committed in the sudden heat of passion to create a jury question.

The judgment is affirmed.